SELZ, SCHWAB & COMPANY, APPELLANTS, V. GEORGE HOCKNELL ET AL., APPELLEES.

FILED JANUARY 8, 1902.   No. 9,692.

Commissioner's opinion, Department No. 1.

1. **Negligence:** HINDERING CREDITORS. Where circumstances show clearly that, notwithstanding defendant's assertions of good faith, he was at least guilty of culpable negligence and was so placing his property as to hinder and delay the collection of his debts, under circumstances showing that by the exercise of any ordinary care he must have known this would be the result, the transaction will not be upheld when the other party participates in the fraud.

2. ———: ———: CONSIDERATION: FACTS. Evidence examined, and *held* to show at least enough facts within defendant's knowledge so that good faith towards his creditors demanded that he make so much investigation as would have shown the worthlessness of the consideration he was receiving for his property.

3. **Action to Set Aside Conveyance:** INSOLVENCY: RETURN NULLA BONA. Where it appears clearly from the record that defendant is insolvent, and that executions have been returned against him unsatisfied, the fact that no execution has been issued on a judgment will not prevent an intervener from recovering upon it when conveyance is set aside in principal action.

4. **Fraudulent Grantee.** Fraudulent grantees, who have disposed of the property conveyed to them, are chargeable as trustees on behalf of the grantor's creditors.

APPEAL from the district court for Lancaster county. Heard below before HOLMES, J. Rehearing of case reported in 62 Nebr., 101. *Judgment below reversed.*

*Stephen L. Geisthardt* and *Mockett & Polk,* for appellants.

*Henry H. Wilson, contra.*

HASTINGS, C.

An opinion on this case was rendered at a former hearing and appears at page 101, 62 Nebr. At that hearing there was no oral argument. There seems to have been a misunderstanding of appellants' position owing to a remark of appellants' counsel in his brief that he does not ask that any pure finding of fact by the lower court be overturned. The result was that the case seems to have been considered as turning upon a mere application of law. Counsel seems to indicate in his brief that he is not disputing the good faith in point of fact of Parker, the seller of the goods in question, but argues that his action tended to hinder and delay his creditors, and was therefore constructively fraudulent, and that the action of defendants Simpson and Hocknell was with full knowledge that such would be the effect of their proceeding, and with intention of getting the advantage of it. At the former hearing this was taken as admitting the truth of Parker's declaration that from an examination of the lands offered for his stock he concluded that they were worth from $7 to $10 an acre. Now, however, counsel for appellant in his brief on rehearing has gone too far the other way, and denounces the conduct of defendant Parker in such vigorous terms as seem scarcely compatible with due respect for the trial court or for this one. It was conceded at the former hearing that the lands were of no value whatever above the incumbrance of $8,500, which it was agreed should be placed upon them. But it was thought that, if

Parker acted honestly under the supposition that they were valuable, his creditors could not complain.  That the defendants Simpson and Hocknell knew that Parker was indebted and in failing circumstances, knew that these goods were worth at least $14,000 to $16,500 in cash and would invoice at cost prices $22,000, and traded for them lands which they knew to be entirely valueless beyond the amount of the agreed incumbrance, is admitted.  The question remains simply as to whether Parker, in making this trade, was acting in such good faith with his creditors that they are bound to accept the result.  It appears, in the first place, that Mr. Parker had been having difficulty in meeting his bills, and had been asking extensions for a year or more.  For about a year and a half he had been negotiating with Simpson in reference to trading his stock for land.  It appears that he had made one previous trip to western Kansas to examine lands, and within two weeks before making this trade had visited Benkelman, in Dundy county, and had examined as many pieces of land in that immediate vicinity as he could do in one half day, and had returned to Benkelman for dinner.  It seems that Simpson made no claim to having personal knowledge of the quality of these lands.  While at Benkelman, in Parker's presence, Simpson made "a partial arrangement with a native" to examine the fifty-two quarter sections of land involved, and rate them as good, bad and indifferent.  This "native" was a liveryman, as to whose disinterestedness and other qualifications as a land appraiser Parker seems not to have inquired.  It is clear now, and by the slightest effort on his part would have been then, that it was not worth his while to ask.  It did not matter to either buyer or seller in the least how the fifteen quarters which Parker was to get were selected.  Parker then went back to Lincoln, and almost immediately made the transfer of his stock.  The first proposition had been to deed him clear land on which he should make mortgages to the extent of $8,500, and then use the equities to settle with his creditors.  This proposition Parker refused to accept, because he would not render

himself liable for deficiency judgments on the mortgages, claiming also that his wife would not sign them. This was after his examination of the land, as to which he does not say that he thought it was worth $7 to $10, but as to which he says "he had reason to think" it was worth that. What that reason was he does not say. He could hardly have believed that the lands farther from Benkelman, and outside of the valley, were more valuable than those near by. By his own testimony, all the lands examined were deserted. What single fact he learned that would indicate to him there was any such value in this land, he does not state, except that he saw crops out there that looked perhaps better than those around Lincoln. How crops looked around Lincoln in the last of August, 1895, is not in evidence. Thomas Hamilton, farmer, fifty-four years old, ten years in Dundy county, testifies to the value of forty-five quarter sections out of the list submitted. The total value, September 5, 1895, when the goods were transferred, he gives as $9,570 of the forty-five quarters, an average of $212.66. The other seven quarters were third grade. He says there might have been fifteen quarter sections selected which would have brought from $250 to $300 each, if unincumbered, but that there were no fifteen quarters in the lot worth anything near the amount of the $8,500 incumbrance which was stipulated for. He had examined all the lands in company with Houston C. Winchester, Chester Thompson, S. J. McMurray and John H. Leslie. They all testified to substantially the same effect. W. H. Hoover and I. J. George were acquainted with part of the lands and agreed with them in their testimony. There is absolutely no rebuttal of this showing. The slightest investigation, in good faith, would have shown Mr. Parker, as undoubtedly it did, that these lands had no market value equal to one-half the proposed incumbrance. That Mr. Parker made any investigation in good faith, can hardly be pretended. That he had no confidence in the value of these lands is shown clearly by his refusal to execute any mortgages for that precise reason, as well as because his

wife would not sign. The explanation of his conduct in going to Benkelman and looking at a few pieces in the immediate vicinity and returning without making any effort to ascertain which were the good, bad and indifferent sections, leaving the whole matter to be determined by a liveryman in the employ of Simpson, and then closing up the trade without waiting for his report, must be that he did not desire any very definite information about these lands, which he was going to put off upon his creditors. That there was anybody in Benkleman from whom he learned that these lands had any market value at all, is not pretended. It appears that 1895 was the third year of failure, and by September 5, when this trade was made, the fact of a failure for that year was thoroughly established. Mr. Parker could not shut his eyes to the plain truth about these lands, and claim good faith in supposing them valuable. It is true that Mr. Parker says that he paid $5,700 of the money he received upon his indebtedness to the First National Bank of Lincoln, but we are constrained to think that this transaction was not in good faith on Mr. Parker's part, nor made because he was honestly deceived as to the value of these Dundy county lands, which he never took any steps to select, which were so worthless that Simpson did not get the mortgage upon them, and as to which Simpson himself remarked a few weeks later that he would not take them back at any price. The district court, and this one at the former hearing, did not give full effect to this undisputed evidence. That Mr. Parker, in getting this land incumbered to twice its value for his general creditors, was in good faith doing what he regarded was for their interest as well as his own, is simply impossible to believe.

Counsel for appellant, in his reply brief makes the general proposition, "It will not do to say that, because a trial judge is so constituted morally that he can not see fraud in a shady transaction, therefore this transaction does not constitute fraud." At the hearing he disclaims any personal application of this to the trial court, or to

this one, but, in our opinion, it conveys a disrespectful allusion, which would have called for the striking of the brief from the files, if complaint had been made on that ground and the court's attention called to it. Mr. Parker seems to have been a man of high standing and reputation. Counsel seems to have conducted his case with a view to that, and to have carefully avoided attacking him both at the trial in district court and in the original brief on appeal. When counsel hesitates to assail Parker's good faith, he ought not to complain of any court which declines to find against it. It must be impeached, or this action fail. This suit is based on express allegations of fraud on Parker's part, and participated in by Simpson and Hocknell. If Parker's action was in good faith, there is no action here. The trial court was justified in hesitating to find against his positive assertion to the contrary that he had an intention to interfere with the rights of his creditors, merely because of the peculiar manner in which he set about as he claimed to protect them. It seems to us, however, clear that in taking these worthless lands under circumstances that indicate, especially in view of his later actions, that he knew them to be worthless, he was not acting in good faith, and no asseverations of it on his part can whitewash the transaction.

It appears that in the case of one of the interveners no execution was ever issued on the judgment. It is not thought that this should prevent a recovery where it amply appears from other parts of the record that the judgment debtor is wholly insolvent, and the judgment unpaid. *Sayre v. Thompson,* 18 Nebr., 33, 39. No question seems to be raised here by defendants as to this point. His creditors were entitled to the same regard he showed for himself and his wife in refusing to make mortgages on these lands. It appears by the admission of Simpson himself that this stock of goods was worth at least $14,000. It appears also by his clear admission that nothing was ever given for it except the $8,500. The lands in fact were never either selected, mortgaged or conveyed. It was worth no one's while to have it done

The judgments of the plaintiff and of the interveners in this action are as follows: Selz, Schwab & Co., November 16, 1895, $1,000; costs, $31.85; increased costs on execution, 60 cents. Hazen B. Goodrich & Co., February 27, 1896, $67.45; costs, $1.45. Little, Maxwell & Co., December 9, 1895, $898.60; costs, $1.45. Henry Schwab and Alfred Schwab, October 19, 1895, $170.50; costs, $4.35. Bentley Shoe Company, September 28, 1896, $150.07; costs, $1.70. J. Richardson & Co., March 30, 1896, $86.40; costs, $1.45.

It is recommended that the decree of the district court be reversed, and a decree entered and a finding made in this court of the amount due the plaintiff and the several interveners, and that the same is due from the defendant Hocknell and the estate of William Simpson, deceased, a decree entered for the payment of that amount, and execution therefor awarded, and such decree certified to the district court of Lancaster county for execution.

DAY and KIRKPATRICK, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed, and a decree will be entered and a finding made in this court of the amount due the plaintiff and the several interveners, and that the same is due from the defendant Hocknell and the estate of William Simpson, deceased, and a decree entered for the payment of that amount, and execution awarded therefor, and such decree certified to the district court of Lancaster county for execution.

JUDGMENT ACCORDINGLY.